UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
DEBORAH DONOGHUE et al., :
:
Plaintiffs, :
: 21-CV-4811 (JMF)
-v- :
: OPINION AND ORDER
DAVID D. SMITH et al., :
:
Defendants. :
:
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

In this shareholder derivative action, shareholders of Sinclair Broadcast Corporation ("Sinclair") seek disgorgement of approximately $5.5 million in alleged short-swing profits realized by David D. Smith, a corporate insider of Sinclair. In particular, Plaintiffs allege that Smith acquired Sinclair shares from certain Grantor Retained Annuity Trusts or "GRATs" that he had established for the benefit of his children and, within six months of doing so, sold some of those shares on the open market, thereby triggering liability under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (the "Exchange Act"). Smith now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' claims. In particular, he argues that, under applicable regulations, his acquisitions of stock from the GRATs were exempt from Section 16(b). In the alternative, he contends that his alleged acquisitions of Sinclair stock do not constitute "purchases" within the meaning of Section 16(b). For the reasons that follow, the Court disagrees and, thus, Smith's motion to dismiss is DENIED.

## BACKGROUND

In considering a Rule 12(b)(6) motion, courts are limited to the facts alleged in the complaint, which must be assumed to be true. *See, e.g., Burch v. Pioneer Credit Recovery, Inc.*,

551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  A court may also consider "documents incorporated into the complaint by reference," including "legally required public disclosure documents filed with the" Securities and Exchange Commission ("SEC").  *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).  Accordingly, the following facts are taken from the Amended Complaint ("Complaint") and documents incorporated by reference therein.

A Grantor Retained Annuity Trust or GRAT "is an estate planning device designed" to enable the settlor — that is, the person who establishes the GRAT — to "mak[e] gifts of future appreciation of securities or other assets" to certain designated beneficiaries.  Peter J. Romeo & Alan Dye, Section 16 Treatise and Reporting Guide § 4.05[5][b], at 382 (5th ed. 2019) ("Romeo & Dye").  To create a GRAT, a settlor transfers assets, such as securities, to an irrevocable trust, while retaining the right to receive fixed annuity payments over the term of the GRAT.  *Id*.  Generally, the sum total of those annuity payments will equal the present value of the assets transferred into the GRAT at the time of its creation.  *Id.*; *see also Morales v. Quintiles Transnat'l Corp.*, 25 F. Supp. 2d 369, 371 n.4 (S.D.N.Y. 1998) ("*Quintiles*") (describing GRATs designed to "zero[] out" over the annuity period).  After the annuity period expires, any assets remaining in the GRAT (representing any appreciation in value of the contributed assets over the life of the GRAT) are then distributed to the residual beneficiary or beneficiaries.  Romeo & Dye § 4.05[5][b], at 382; *see also id.* § 6.02[3][c], at 557.  According to the parties, this structure is designed to enable the settlor to pass on any appreciation in the contributed assets to the GRAT beneficiaries "free of gift and estate tax."  ECF No. 23 ("Pls.' Opp'n"), at 3; *see* ECF No. 18 ("Def.'s Mem."), at 4-5.

Smith is an officer, director, and beneficial owner of more than ten percent of the common stock of Sinclair — a Maryland-based media corporation.  ECF No. 29 ("Compl."),

¶¶ 2, 6.  On March 17 and November 23, 2020, Smith established two series of GRATs for the benefit of his children.  *See* Compl. ¶¶ 14-15; ECF No. 16-2 ("Series II Agreement"), at 2; ECF No. 16-4 ("Series III Agreement"), at 2.[1]  Each GRAT designated Steven A. Thomas and Paul O. Wallace as the "Trustee[s]," Series II Agreement 2; Series III Agreement 2, and one of Smith's four children as the residual beneficiary, *see* Compl. ¶¶ 14-15; *see* Series II Agreement 4, 19, 34, 49, 64; Series III Agreement 4, 18, 32.[2]  Each GRAT further designated Smith as the "Settlor," Series II Agreement 2; Series III Agreement 2, and provided explicitly that, "[i]n no event shall the Settlor serve as a Trustee," Series II Agreement 10; Series III Agreement 10.

The GRAT Agreements further provided that "the Settlor" — that is, Smith — "hereby assigns, transfers, conveys, and delivers to the Trustee[s], all of Settlor's right, title and interest in and to" a certain number of shares of "Class B Common Stock of Sinclair" and that the Trustees "shall hold and administer this property (the 'Trust Estate') for the trusts, uses and purposes set forth" in each Agreement.  Series II Agreement 2; Series III Agreement 2.  The Agreements also granted the Trustees the power to "sell or otherwise dispose of" "any or all property comprising the Trust Estate" and to "manage, . . . sell (publicly or privately), convey, . . . transfer, exchange, . . . and otherwise dispose of . . . any property of whatsoever character, . . . which in any manner or at any time may be part of the Trust Estate."  Series II Agreement 4-5; Series III Agreement 4-5.  The Trustees could exercise these powers "freely"

---

[1]   References to page numbers in the Series II and III GRAT Agreements, ECF Nos. 16-2, 16-4, are to the page numbers automatically generated by the Court's Electronic Case Filing ("ECF") system.

[2]   The terms of the Series II GRAT Agreements are identical, as are the terms of the Series III GRAT Agreements.  *See* Series II Agreement; Series III Agreement; *see also* Def.'s Mem. 6. Although there are minor variations between the two Series, *see* Def.'s Mem. 8, the relevant terms described herein are identical, unless otherwise noted.

3

and "at any time," provided that they acted in a "fiduciary capacity." Series II Agreement 4, 8; Series III Agreement 4, 8. Significantly, however, Smith retained the right "to acquire from the Trust all or any portion of the Trust Estate by substituting in lieu thereof other property of an equivalent value." Series II Agreement 3; Series III Agreement 3. He possessed this "power to substitute" in a "non-fiduciary capacity." Series II Agreement 3; Series III Agreement 3. Although the Agreements provide that "the Trustee[s] shall, upon demand by Settlor, distribute such property [in the Trust Estate] to Settlor upon delivery of the Substitute Property to the Trustee[s] by Settlor," they also provide that "if the Trustee[s] suspect[] that the property to be received in exchange for the property returned to the Settlor is not of equivalent value, the Trustee[s] must obtain a court determination that the properties have equivalent value." Series II Agreement 3; Series III Agreement 3. Finally, each Agreement states that its terms are "irrevocable and not subject to amendment by the Settlor in any respect." Series II Agreement 2; Series III Agreement 2.

     Plaintiffs allege that, over the course of 2019 and 2020, Smith made four "purchases" of Sinclair Class B common stock from the GRATs. Compl. ¶¶ 12-15. On July 10, 2019, Smith acquired a total of 395,000 shares of Sinclair Class B common stock at $55.10 per share through "a substitution of the corpus of a trust believed to be a GRAT [for the benefit of] his child." *Id.* ¶ 12 (cleaned up). On March 17, 2020, he acquired through another substitution 3,255,000 such shares at $13.54 per share. *Id.* ¶ 13. Likewise, on November 20, 2020, Smith acquired another 3,255,000 shares of Sinclair Class B common stock, this time at $26.76 per share, from a "GRAT established by [Smith] on March 17, 2020, which was governed by the 'Series II'" Agreement. *Id.* ¶ 14. And, finally, on December 23, 2020, Smith acquired 1,500,000 shares of the same stock at $26.76 per share from a "GRAT established by [Smith] on November 23,

4

2020, which was governed by the 'Series III'" Agreement. *Id.* ¶ 15. The purchase prices "for the Class B shares purchased from the GRATs in each" transaction "were within the range of prices at which [Sinclair] Class A shares traded on the open market on each of the respective purchase dates." *Id.* ¶ 17. Sinclair Class B common stock "was and is convertible at the holder's election into Class A common stock on a one-for-one basis and has no expiration date." *Id*. ¶ 16.

On four occasions between November 2019 and March 2021, Smith also transferred or sold Sinclair Class A common stock. On November 15, 2019, he transferred approximately 45,000 such shares to a trust "believed to be a GRAT" "in 'substitution' for the corpus of the trust." *Id.* ¶ 20. Additionally, on March 19, 2021, Smith sold approximately 250,000 shares of Sinclair Class A common stock "on the open market at reported prices between $34.22 and $35.105 per share." *Id.* ¶ 23. He did the same on two separate occasions on March 22, 2021, selling, first, approximately 260,000 Class A Sinclair shares "at prices between $33.5514 and $34.28 per share" and, second, approximately 75,000 such shares "at prices between $33.95 and $34.32 per share." *Id.* ¶¶ 24-25. Using the "lowest-in, highest-out" methodology, Plaintiffs estimate that Smith made approximately $5.5 million in short swing profits through these transactions. Compl. ¶ 26; *see, e.g.*, *Donoghue v. Nat. Microsystems Corp.*, 198 F. Supp. 2d 487, 492 (S.D.N.Y. 2002) (describing this method of calculating profits under Section 16(b)).

## APPLICABLE LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burch*, 551 F.3d at 124. A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

As noted, "[i]n determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference." *Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).  The court is "not obliged to accept the allegations of the complaint as to how to construe such documents," but must "resolve any contractual ambiguities in favor of the plaintiff." *Id.*  Additionally, as relevant here, when reviewing any public SEC filings referenced in the complaint, courts should "examine the document only to determine *what* the document stated, and *not to prove the truth of its contents*." *Chechele v. Scheetz*, 466 F. App'x 39, 40-41 (2d Cir. 2012) (summary order) (cleaned up).

Section 16(b) of the Exchange Act, pursuant to which Plaintiffs bring their claims, "imposes strict liability on [corporate] insiders whose purchases and sales of securities result in 'short-swing profits.'" *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 215 (2d Cir. 2012) (citing 15 U.S.C. § 78p(b)).  It provides, in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by [a corporate insider] by reason of his relationship to the issuer, any profit realized by [the insider] from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of [the insider].

6

15 U.S.C. § 78p(b). Section 16(b) thus compels statutory insiders — namely, "directors, officers, and 'beneficial owners' of more than 10% of a company's registered securities," *Huppe*, 670 F.3d at 215 — "to disgorge profits earned on any purchase and sale (or sale and purchase) [of the corporation's securities] made within six months of each other," *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998). "Significantly, no showing of actual misuse of inside information or of unlawful intent is necessary to" demonstrate Section 16(b) liability. *Huppe*, 670 F.3d at 218. Instead, "to state a claim under the statute, a plaintiff must plausibly allege that 'there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities" (i.e., an insider) "(4) within a six-month period.'" *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 125 (2d Cir. 2018) (quoting *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)).

## DISCUSSION

Smith moves to dismiss Plaintiffs' Section 16(b) claims on two grounds. First, he argues that his acquisitions of Sinclair stock from the GRATs are exempt from Section 16(b) by virtue of SEC Rule 16a-13. *See* Def.'s Mem. 9 (citing 17 C.F.R. § 240.16a-13). Second, he argues that, even if that exemption does not apply, his acquisitions of Sinclair stock do not constitute "purchases" within the meaning of Section 16(b). *See* Def.'s Mem. 16-20. The Court will address each argument in turn.

**A. The Rule 16a-13 Exemption**

Smith's first argument is that his acquisitions of Sinclair stock from the GRATs are exempt from Section 16(b) pursuant to SEC Rule 16a-13. To the extent relevant here, SEC Rule 16a-13 exempts "transaction[s] . . . that effect[] only a change in the form of beneficial

ownership without changing a person's pecuniary interest in the subject equity securities." 17 C.F.R. § 240.16a-13. Such "change[s] in the form of beneficial ownership" typically include changes from indirect to direct ownership over securities (or vice versa). *See* Romeo & Dye, § 6.02[3], at 553-54. For instance, the SEC has indicated that "distributions of equity securities from an employee benefit plan to an insider participant would be a mere change in the form of beneficial ownership from indirect to direct where the securities previously had been attributed to the insider." *Chechele v. Standard Gen. L.P.*, No. 20-CV-3177 (KPF), 2021 WL 2853438, at *8 (S.D.N.Y. July 8, 2021) (quoting Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Releases Nos. 34-37260, 35-26524, 61 Fed. Reg. 30376, 30385 n.117 (June 14, 1996)).

Smith argues that his acquisitions of Sinclair stock from the GRATs between 2019 and 2020 "merely changed the form of his beneficial ownership of the stock from indirect to direct," and are therefore exempt from Section 16(b). Def.'s Mem. 9; *see also id.* at 9-16. But the Court is unpersuaded because Smith fails to establish, as a matter of law, that he maintained beneficial ownership over the shares after they were transferred to the GRATs. To the extent relevant, Rule 16a-1, the SEC regulation implementing Section 16(b), *Mercer v. Gupta*, 880 F. Supp. 2d 486, 490 (S.D.N.Y. 2012), defines "beneficial owner" as "'any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities,'" *Feder v. Frost*, 220 F.3d 29, 33 (2d Cir. 2000) (quoting 17 C.F.R. § 240.16a-1(a)(2)).[3] The Rule further defines "pecuniary interest"

---

[3]  The SEC Rules actually provide "[t]wo definitions of 'beneficial owner,'" *Feder*, 220 F.3d at 33, but only one is relevant here. The first is used "[s]olely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to section 12 of the [Exchange] Act," that is, whether they are a statutory "insider." *Id.* at 33 (quoting 17 C.F.R. § 240.16a-1(a)(1)). The second is used for all purposes

as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a-1(a)(2)(i). And it defines an "indirect pecuniary interest" to include, as relevant here, "[a] person's interest in securities held by a trust, as specified in § 240.16a-8(b)" ("Rule 16a-8(b)"). 17 C.F.R. § 240.16a-1(a)(2)(ii).

Rule 16a-8(b), in turn, establishes the circumstances under which, among other things, an insider is deemed to have beneficial ownership of securities held by a trust. *See* 17 C.F.R. § 240.16a-8(b); *see, e.g.*, *Dreiling ex rel. Infospace, Inc. v. Kellett*, 281 F. Supp. 2d 1215, 1220 (W.D. Wash. 2003) ("[Rule 16a-1(a)(2)] refer[s] to [Rule 16a-8(b)] to determine how to analyze beneficial ownership in the specific context of trusts."); *see also* Romeo & Dye § 4.05, at 363-64. With respect to settlors, the Rule provides that "if the settlor does not exercise or share *investment control* over the issuer's securities held by the trust, the trust holdings and transactions shall be attributed to . . . the trust instead of the settlor." 17 C.F.R. § 240.16a-8(b)(4) (emphasis added). Here, according to the Complaint and the GRAT Agreements referenced therein, Smith "established" the GRATs and was designated the "Settlor" for each. Compl. ¶¶ 14-15; Series II Agreement 2; Series III Agreement 2.[4] Thus, whether or not Smith

---

"other than for . . . determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered under Section 12 of the Act," 17 C.F.R. § 240.16a-1(a)(2), including to determine "which transactions must be reported under Section 16(a) as effecting a change in beneficial ownership or as triggering liability under Section 16(b)," *Feder*, 220 F.3d at 33. Only the latter is relevant to the question of whether Smith maintained beneficial ownership over the shares after he transferred them to the GRATs because there is no dispute that he was an "insider" under the statute by virtue of being an officer and director throughout the relevant time period. *See* Compl. ¶ 6; *see also, e.g.*, *Feder*, 220 F.3d at 32-34; *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 390 (S.D.N.Y. 2019) ("Once a person is deemed a corporate insider, the second definition of beneficial owner comes into play for purposes of the short-swing-profit liability provisions of Section 16."), *aff'd*, 959 F.3d 541 (2d Cir. 2020).

[4]   Plaintiffs do not expressly allege in their Complaint that Smith "established" the GRATs associated with his alleged July 10, 2019 and March 17, 2020 acquisitions. *See* Compl. ¶¶ 12-13. In addition, the paragraphs referencing those GRATs do not cite to any specific GRAT Agreements in the record. *See id.* That said, Smith does not dispute that he established these

beneficially owned the Sinclair shares when they were held by the GRATs turns on whether he "exercise[d] or share[d] investment control over the [Sinclair] securities held by the trust[s]." 17 C.F.R. § 240.16a-8(b)(4).

Although the parties agree that whether Smith had "investment control" is the key question, they disagree on how to define the term in this context. *See* Pl.'s Opp'n 7-8; ECF No. 24 ("Def.'s Reply"), at 2-4. Neither Rule 16a-8 nor Rule 16a-1 contains a definition. *See* 17 C.F.R. §§ 240.16a-1, 240.16a-8(b). Plaintiffs argue the Court should adopt the definition of "control" set forth in SEC Rule 12b-2. Pl.'s Opp'n 8. Rule 12b-2 defines the "[t]he term 'control'" to "mean[] the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2. By contrast, Smith urges the Court to treat "investment control" as equivalent to "investment power," which is defined in SEC Rule 13d-3[5] to "include[] the power to dispose, or to direct the disposition of, [the] security." 17 C.F.R. § 240.13d-3(a)(2). According to Smith, this means that a person has "investment power" — and thus "investment control" — "over securities if the person has the ability to 'veto' or

---

GRATs and that the agreements creating them contain provisions materially identical to those in the Series II and III GRAT Agreements. *See* Def.'s Mem. 6-8. Thus, the Court assumes, for the purposes of this motion, that the relevant terms of these GRATs were materially identical, if not the same. Indeed, Smith has waived any argument to the contrary. *See Fieldcamp*, 242 F. Supp. 2d at 391.

[5]     Smith references "Section 13(d) of the Exchange Act," Def.'s Reply 3, but that Section does not use, let alone define, the term "investment power," *see* 15 U.S.C.A. § 78m(d). Instead, the definition of "investment power" that Smith paraphrases appears to come from Rule 13d-3(a)(2). *Compare* Def.'s Reply 3 ("Section 13(d) of the Exchange Act. . .. defines the term to mean the power to dispose, or to direct the disposition of, securities."), *with* 17 C.F.R. § 240.13d-3(a)(2) ("Investment power . . . includes the power to dispose, or to direct the disposition of, such security."). The Court thus assumes that Smith meant to reference the Rule.

prevent the disposition of securities by the person who proposes to dispose of them." Def.'s Reply 3.

The Court need not and does not resolve the parties' interpretive dispute at this stage of the litigation. That is because, under either definition of "investment control," Smith's motion fails. Nothing in the Complaint or the GRAT Agreements incorporated therein suggests that Smith possessed *either* the power to "direct or cause the direction of the management and policies of" persons controlling the GRATs, 17 C.F.R. § 240.12b-2, or the power to "dispose, or to direct the disposition of" the securities held by the GRATs, *id.* § 240.13d-3(a)(2). For starters, the Complaint itself contains no such allegations. *See* Compl. ¶¶ 6-7, 12-26. And the GRAT Agreements suggest the opposite. Each Agreement provides that Smith "assigns, transfers, conveys, and delivers to the Trustee[s], all of [his] right, title and interest in and to" the shares of "Class B Common Stock of Sinclair" held by the trust. Series II Agreement 2; Series III Agreement 2. The Agreements also explicitly give the *Trustees*, not the Settlor, the authority to "sell" or "otherwise dispose" of "any or all property comprising the Trust Estate" and to "manage, . . . sell (publicly or privately), convey, . . . transfer, exchange, . . . and otherwise dispose of . . . any property of whatsoever character, . . . which in any manner or at any time may be part of the Trust Estate." Series II Agreement 4-5; Series III Agreement 4-5. The Agreements further state that Smith, as the designated "Settlor," can "[i]n no event . . . serve as a Trustee." Series II Agreement 2, 10; Series III Agreement 2, 10. Taken together, these provisions appear to endow the Trustees, not Smith, with "investment control" over the Sinclair shares transferred to the GRATs under either proposed definition.

Smith's counterarguments fail to persuade. First and foremost, he argues that the "substitut[ion]" provision in the GRAT Agreements — pursuant to which he retained the right

11

"to acquire from the Trust all or any portion of the Trust Estate by substituting in lieu thereof other property of an equivalent value," Series II Agreement 3; Series III Agreement 3 — gave him the "power at all times to 'veto' any sale proposed by the trustees," Def.'s Reply 4.  But Smith does not cite, nor has the Court found, any provision in the GRAT Agreements requiring the Trustees to "propose" sales to Smith for his approval.  *See id.*  To the contrary, as noted, the Trustees had the sole power to "sell" or "otherwise dispose of" the shares held in the trust "at any time," provided that they acted in a "fiduciary capacity."  Series II Agreement 4, 8; Series III Agreement 4, 8.  Moreover, the substitution provision itself makes plain that Smith's power to substitute property of equivalent value was subject to approval by the Trustees: "[I]f the Trustee[s] suspect[] that the property to be received in exchange for the property returned to the Settlor is not of equivalent value, the Trustee[s] must obtain a court determination that the properties have equivalent value."  Series II Agreement 3; Series III Agreement 3.  Thus, the substitution provision does not give Smith the "veto" power he claims it does.

Smith's related argument — that the substitution provision makes him "the 'de facto' trustee of the trust for purposes of Rule 16a-8" — also falls short.  Def.'s Reply 4.  Conspicuously, Smith does not cite any authority to support the (unlikely) proposition that the right to substitute property of equivalent value, subject to approval by trustees with full power to administer the trust, is legally sufficient, on its own, to make someone a "de facto" trustee.  *See* Def.'s Reply 4.  The one authority Smith does cite, a two-sentence SEC No-Action Letter from 1991, is not on point; it discusses Section 16 reporting requirements for trusts where an insider's spouse acts as a trustee.  *See Ralston Purina Co.*, Fed. Sec. L. Rep. ¶ 79,699C, 1991 WL 178822 (SEC No-Action Letter May 6, 1991).  Additionally, the letter itself indicates that any de facto trustee analysis would have to consider "the particular facts and circumstances" of the insider's

12

"investment control over the trust." *Id.* at *1. As noted, Smith's "de facto" trustee argument is certainly not supported by any allegations in the Complaint. *See* Compl. ¶¶ 6-7, 12-26. And it is directly contrary to the GRAT Agreements' explicit prohibition on Smith serving as trustee. *See* Series II Agreement 10 ("In no event shall the Settlor," i.e., Smith, "serve as the Trustee."). At most, therefore, the substitution provision creates ambiguity as to Smith's ability to direct the investment decisions of the nominal trustees as a "de facto" trustee — ambiguity which the Court must "resolve . . . in favor of the plaintiff" at this stage in the litigation. *Subaru Distributors Corp.*, 425 F.3d at 122. Smith's de facto trustee argument thus fails to move the needle.[6]

The same goes for Smith's argument based on the Statements of Changes in Beneficial Ownership of Securities (the "Forms 4") that he filed with the SEC. *See* Def.'s Reply 1, 4-5. Smith contends that he "admitted" in these filings that he "remained the beneficial owner of the Sinclair stock after it was contributed to the GRATs." *Id.* at 1. He further asserts that the Forms "establish that the named trustees never . . . converted or sold any of the Sinclair stock Smith contributed to the GRATs or otherwise exercised any investment control over the stock." *Id.* But while the Court may consider the Forms 4 in connection with this motion — both because they are incorporated by reference into the Complaint, *see* Compl. ¶¶ 12-15, and because they

---

[6] In his opening brief (but not in his reply), Smith also draws on additional facts, not contained in the Complaint or documents incorporated therein by reference, to support the argument that he is the "de facto trustee." *See* Def.'s Mem. 7 n.9. For instance, Smith asserts that "[t]he nominal trustees of the GRATs . . . [are] Smith's personal attorney and accountant." *Id.* He also claims, without citation, that "the nominal 'trustees' of the GRATs[] ha[ve] no investment discretion over the GRATs." *Id.* at 16 n.16. But, as Smith well knows, *see* Def.'s Mem. 8-9, at this stage in the litigation, the Court is limited to the facts alleged in the Complaint, which the Court must accept as true, and to documents incorporated by reference into the Complaint, *see Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). Smith's reliance on extrinsic facts is therefore improper.

are "legally required public disclosure documents filed with the SEC," *Kleinman*, 706 F.3d at 152 — the Court may not, at Smith's request, rely on his statements in the Forms for their truth. *See Chechele*, 466 F. App'x at 40-41 (holding that, when reviewing public SEC filings referenced in a complaint on a motion to dismiss, courts should "examine the document only to determine *what* the document stated, and *not to prove the truth of its contents*" (cleaned up)); *see also Wagner v. Royal Bank of Scotland Grp. PLC*, No. 12-CV-8726 (PAC), 2013 WL 4779039, at *3 (S.D.N.Y. Sept. 5, 2013) (holding that statements in Form 4 filings are "hearsay" if offered by the declarant "to establish the truth of the matters asserted in those statements"). Thus, Smith's self-serving statements in the Forms 4 are not the silver bullets he thinks they are.

Finally, the parties spill much ink on the applicability of a 1997 SEC No-Action letter, *Peter J. Kight*, Fed. Sec. L. Rep. ¶ 77,403, 1997 WL 35393250 (SEC No-Action Letter October 16, 1997) (the "Kight Letter"), and *Quintiles*, a 1998 decision by Judge Richard Owen. *See* Def.'s Mem. 10-14; Pl.'s Opp'n 11-14. Neither authority, of course, is binding here. *See, e.g.*, *Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 145 (2d Cir. 2002) ("SEC no-action letters constitute neither agency rule-making nor adjudication and thus are entitled to no deference beyond whatever persuasive value they might have."); *Dervan v. Gordian Grp. LLC*, No. 16-CV-1694 (AJN), 2017 WL 819494, at *11 n.6 (S.D.N.Y. Feb. 28, 2017) ("SEC no-action letters are not binding on federal courts."). Nevertheless, Smith claims the former "confirm[s]" his Rule 16a-13 argument, while Plaintiffs claim the latter refutes it. Def.'s Mem. 10; Pls.' Opp'n 12-14. Plaintiffs' contention is closer to the mark, but neither contention survives scrutiny. Although both the Kight Letter and *Quintiles* addressed Section 16(b) liability with respect to transfers or substitutions either into or out of GRATs, they are distinguishable because, in both, the insider was not only the settlor of the GRAT, but also the

trustee. *See Quintiles*, 25 F. Supp. 2d at 371 n.2 ("The trustees were [the insider-settlor] himself and one Leslie Lammers."); Kight Letter, 1997 WL 35393250 ("Grantor [(the insider-settlor)] would be the trustee of the [proposed] GRAT."). In fact, in the case of the Kight Letter, the insider-settlor was *also* "the beneficiar[y]" of the proposed GRAT. *Id.* Indeed, as commentators have noted, the SEC "staff's position in the Kight [L]etter was based on the fact that the insider-[settlor], *by virtue of being both the trustee and lifetime beneficiary of the GRAT*, would be deemed under Rule 16a-8(b)(2) to be the indirect beneficial owner of the issuer securities contributed to the GRAT." Romeo & Dye, § 6.02[3][c], at 558 (emphasis added) (citing Kight Letter, 1997 WL 35393250). Thus, neither authority speaks to the situation here, where the insider, Smith, was merely the settlor, and not a trustee or beneficiary of the GRATs. *See* Series II Agreement 2, 10; Series III Agreement 2, 10.[7]

In sum, for the reasons stated above, the Court concludes that Smith fails to demonstrate that the Rule 16a-13 exemption applies to the transactions at issue based on the face of the Complaint and the documents incorporated by reference therein.[8] Accordingly, Smith's motion to dismiss Plaintiffs' claims on those grounds must be and is DENIED.

---

[7]    Underscoring the distinction between the situation in Kight and the situation here, Kight conceded, and the SEC staff agreed, that any transactions in the shares held by the GRAT would be deemed to be his transactions for purposes of Section 16(b). *See* Kight Letter, 1997 WL 35393250 (Kight conceding that "[g]rantor . . . would remain subject to Section 16 liability with respect to any sales of the Shares by the GRAT."); *id.* (SEC staff concluding that "[o]ther transactions in the Shares by the GRAT during the Annuity Period would be considered transactions by the Grantor"). It is hard to imagine that Smith would concede the same here. Nor would it make sense to deem transactions by the Trust to be transactions by him given his lack of control over such transactions.

[8]    In light of the foregoing, the Court need not, and does not, reach whether Smith's alleged acquisitions of Sinclair stock "chang[ed] [Smith's] pecuniary interest in" those stocks for purposes of Rule 16a-13. 17 C.F.R. § 240.16a-13.

15

B. **Smith's Alleged "Purchases"**

Smith's alternative argument — that his alleged acquisitions of Sinclair shares from the GRATs do not qualify as "purchases" under Section 16(b), *see* Def.'s Mem. 16-20 — also comes up short. Under the Exchange Act, the term "purchase" "include[s] any contract to buy, purchase, *or otherwise acquire*" securities. 15 U.S.C. § 78c(13) (emphasis added). This "broad" definition not only covers "traditional cash-for-stock transactions," but also, "at least arguably, reach[es] many transactions not ordinarily deemed a sale or a purchase." *Kern Cty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593-94 (1973); *accord Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 128-29 (2d Cir. 2018).[9] "Where . . . the transaction at issue does not plainly fall within the literal terms of the statute, '[t]he judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with the legislative purpose.'" *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 124 (2d Cir. 2002) (quoting *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969)). "But such a resort to . . . the purpose of Section 16(b) is appropriate only where the text of the statute or regulations is ambiguous" with respect to the transaction at issue. *Olagues*, 902 F.3d at 129.

Here, there is no such ambiguity. Smith's alleged exchanges of "property of an equivalent value," on the one hand, for the shares held by the trusts, on the other, Series II Agreement 3; Series III Agreement 3, fit comfortably within the statutory definition of "purchase" — especially given that the value of the substitute property matched "the range of

---

[9]  To mitigate the broad sweep of Section 16(b), the Supreme Court has carved out an exception for "unorthodox" or "borderline" transactions, *Kern Cty.*, 411 U.S. at 593-95, which applies where the insider "lacked access to inside information" and his or her "shares were sold involuntarily," *Olagues*, 902 F.3d at 129. Smith, however, expressly disclaims reliance on this exception. Def.'s Reply 8 n.1 ("Plaintiffs appear to confuse Smith's arguments regarding the potential for speculative abuse as an attempt to argue that the substitution of assets in a GRAT is an 'unorthodox transaction.' Not so."). Thus, the Court does not address it here.

16

prices at which [Sinclair] Class A shares traded on the open market" on the acquisition dates, Compl. ¶ 17.[10]  Indeed, those exchanges bore all the hallmarks of "traditional cash-for-stock transactions": They each involved an agreement to exchange property, equal to the current market value of the securities, for those securities.  *Kern Cty.*, 411 U.S. at 593; *cf. Quintiles*, 25 F. Supp. 2d at 371 (holding that a "substitution" from the corpus of a GRAT was a "purchase" under Section 16(b) because, *inter alia*, the defendant "had to pay [the] then-present-market price for the right to reacquire the . . . stock" from the trust).  Notably, Smith himself even used the term "purchase" to describe the transactions in some of his SEC Forms 4.  *See, e.g.*, SEC Form 4, David D. Smith, July 10, 2019 ("The Reporting Person exercised his right to substitute the corpus of a trust and *purchased* the shares from a trust f/b/o Reporting Person's child." (emphasis added)), available at https://sec.report/Document/0001250842-19-000049/#primary _doc.xml; *see also* Compl. ¶ 12 (referencing this Form 4).  So too, in his motion papers here, Smith repeatedly refers to his "re-*acquisition*[*s*]" of the stock.  Def.'s Mem. 12, 14, 16, 18, 20; Def.'s Reply 1-2, 6, 9 (emphasis added).  Applying the plain language of the statutory definition, the Court therefore concludes that Smith's alleged acquisitions of Sinclair stock from the GRATs were "purchases" for the purposes of Section 16(b).  *See* Compl. ¶¶ 12-15.

That is enough to decide the matter.  *See, e.g.*, *Steel Partners II, L.P.*, 315 F.3d at 124 (stating that courts only look to Section 16(b)'s "legislative purpose" where "the transaction at issue does not plainly fall within the literal terms of the statute").  But even if the Court were to look to the statute's purpose, as Smith suggests, *see* Def.'s Mem. 16-17, it would reach the same conclusion.  The purpose of Section 16(b) is to "prevent[] the unfair use of information which

---

[10]   Smith repeatedly asserts that he substituted a "promissory" note for the shares, *see* Def.'s Mem. 1, 7, 12; Def.'s Reply 2, but there is nothing in the Complaint that substantiates that assertion, *see* Compl. ¶¶ 12-15.  In any event, what form the substitute assets took is immaterial.

17

may have been obtained by [a statutory insider] by reason of his relationship to the issuer." *Steel Partners II*, 315 F.3d at 124 (quoting 15 U.S.C. § 78p(b)). Section 16(b) was therefore designed as a "flat rule" to prevent "[i]nsiders [from] exploit[ing] information not generally available to others to secure quick profits." *Kern Cty.*, 411 U.S. at 592. Here, the facts alleged in the Complaint are sufficient to conclude that applying Section 16(b) comports with that purpose. Smith could have, upon learning of non-public information by virtue of his status as an officer and director of Sinclair, *see* Compl. ¶ 6, used the power of substitution in the GRAT Agreements to reacquire Sinclair shares from the GRATs at market value just before a price increase. He could then have sold the shares at a higher price, pocketing the difference and thereby "arrogating the possibility of capital appreciation away from the" trust. Pl.'s Opp'n 18. The "possibility of [such] abuse" of inside information to "secure quick profits" is precisely what Section 16(b) was designed to prevent. *Kern Cty.*, 411 U.S. at 592.

Smith principally counters that "treating an insider's re-acquisition of shares from a GRAT as a purchase is highly unlikely to serve the purpose of Section 16" because "the insider makes all of the investment decisions for the GRAT, and therefore the insider enjoys no informational advantage over the GRAT." Def.'s Mem. 18-19. But, putting aside whether Smith's characterization of Section 16(b)'s purpose is correct, his argument fails on the facts. There is nothing in the pleadings here to support Smith's bald assertion that he "ma[de] all of the investment decisions for the GRAT[s]." *Id.* at 19. To the contrary, as discussed above, the GRAT Agreements indicate that the designated trustees, not Smith, exercised investment control over the securities held in the GRATs. As such, there is no basis on which to conclude that Smith was transacting with "an equally informed party" when he acquired the shares from the GRATs on the dates alleged in the Complaint. Def.'s Mem. 18; *see* Compl. ¶¶ 12-15. Smith's

remaining counterarguments — namely, that the transfers merely moved assets between his own pockets because "all of the GRAT's assets originate[d]" with him, Def.'s Mem. 19, and that "nothing about a GRAT offers an insider an opportunity to increase his or her wealth" because "any increase in wealth the insider realizes based on transactions with or by the GRAT cannot exceed the value the insider would have realized had he or she never created the GRAT to begin with," *id.* — have either already been addressed or also rely on allegations nowhere found in the Complaint, *see* Def.'s Mem. 18-20, and are therefore without merit, *see Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

In short, the Court concludes that Plaintiffs plausibly allege that Smith's (re)acquisitions of Sinclair stock from the GRATs constituted "purchases" within the meaning of Section 16(b). *See* Compl. ¶¶ 12-26. Smith's motion to dismiss on that ground is therefore DENIED.

## CONCLUSION

In sum, Smith's arguments for dismissal fall short. Based on the allegations in the Complaint and the plain terms of the GRAT Agreements, he cannot, at this stage of the litigation, lay claim to exemption from Section 16(b) liability as set forth in SEC Rule 16a-13. And his (re)acquisitions of the Sinclair shares — through an exchange of assets of equal value — plainly qualified as "purchase[s]" for purposes of Section 16(b). Accordingly, and for the reasons stated above, Smith's motion to dismiss must be and is DENIED in full.

Unless and until the Court orders otherwise, Smith shall file its answer to Plaintiffs' claims **within three weeks of the date of this Opinion and Order**. The initial pretrial conference, previously adjourned *sine die*, *see* ECF No. 21, is hereby rescheduled to **June 13, 2022**, at **4:30 p.m.** The parties are reminded that they must file on ECF no later than **Thursday, June 9, 2022**, a joint letter, the contents of which is described in the Court's order scheduling the

initial pretrial conference, ECF No. 7, as well as a proposed Civil Case Management Plan and Scheduling Order attached as an exhibit to the joint letter.

    SO ORDERED.

Dated: April 26, 2022                  _____
       New York, New York               JESSE M. FURMAN
                                         United States District Judge